ñ      ,

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PATRICK J. BUSSARD,                )
                                   )
          Plaintiff,               )
                                   )
     vs.                           ) Civil Action No. 06-235 Erie
                                   )
COMMISSIONER OF SOCIAL             )
SECURITY,                          )
                                   )
          Defendant.               )

**MEMORANDUM OPINION**

**I. Introduction**

Plaintiff, Patrick J. Bussard, seeks judicial review of a

decision of Defendant, Commissioner of Social Security ("the

Commissioner"), denying his applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under

Titles II and XVI, respectively, of the Social Security Act, 42

U.S.C. §§ 401-433 and §§ 1381-1383f.¹  Presently before the Court

are the parties' cross-motions for summary judgment pursuant to

Fed.R.Civ.P. 56.  For the reasons set forth below, Plaintiff's

_____

¹The Social Security system provides two types of benefits
based on an inability to engage in substantial gainful activity:
the first type, SSI, provides benefits to disabled individuals
who meet low-income requirements regardless of whether the
individuals have ever worked or paid into the Social Security
system, and the second type, DIB, provides benefits to disabled
individuals who have paid into the Social Security system.
Belcher v. Apfel, 56 F.Supp.2d 662 (S.D.W.V.1999).  In the
present case, for purposes of eligibility for DIB, Plaintiff
meets the insured status requirements of the Social Security Act
through June 30, 2008.  (R. 17).

1

motion for summary judgment will be granted, and the

Commissioner's cross-motion for summary judgment will be denied.

## II. Background

### A. Procedural History

Plaintiff filed applications for DIB and SSI on February 11,

2004, alleging disability since December 15, 2003 due to anxiety,

panic attacks and premature ventricular contractions ("PVCs").

(R. 77-79, 87, 96-97, 227-29). Following the denial of

Plaintiff's applications for DIB and SSI, he requested a hearing

before an Administrative Law Judge ("ALJ"). (R. 64-67, 68-70).

At the hearing, which was held on February 9, 2006, Plaintiff,

who was represented by counsel, and a vocational expert ("VE")

testified. (R. 32-61).

On May 24, 2006, the ALJ issued a decision denying

Plaintiff's applications for DIB and SSI based on her conclusion

that Plaintiff retained the residual functional capacity ("RFC")

to perform work existing in significant numbers in the national

economy.[2] (R. 15-25). Plaintiff requested review of the ALJ's

decision. (R. 12). However, the request was denied by the

Appeals Council on August 18, 2006, rendering the ALJ's decision

the final decision of the Commissioner. (R. 5-8). This appeal

followed.

_____

[2]The Social Security Regulations define RFC as the most a
claimant can still do despite his or her limitations. See 20
C.F.R. § 404.1545.

2

## **B.   Factual Background**

Plaintiff was born on June 19, 1972. He was 33 years old at the time of the hearing before the ALJ. Plaintiff's education is limited to the 8th grade. He has no vocational training, and he has not obtained a General Equivalency Diploma. (R. 35-37). In the past, Plaintiff has been employed as an oven tender in a metal shop, a dishwasher and cook in several restaurants and a laborer removing asbestos. He last worked in 2003.[3] (R. 107).

In an Adult Disability Report completed on March 29, 2004, Plaintiff indicated that he became unable to work on December 15, 2003 due to severe anxiety, panic attacks and PVCs. Regarding the manner in which Plaintiff's impairments limit his ability to work, Plaintiff indicated that he cannot concentrate and that he cannot be around people because he gets nervous and cranky, his heart beats fast and he feels like he is going to pass out if he does not walk away from them. (R. 96-97).

At the time of the hearing before the ALJ, Plaintiff was

---

[3]In connection with his work history, Plaintiff testified as follows: "... it was hard for me to keep a job through the years. ... I was always acting out, throwing things, arguing with my bosses, co-workers, things of that nature." (R. 38). As to his last job, which was a cook in a restaurant, Plaintiff testified that he quit because he "had words" with "quite a few" of the employees, and he did not get along with one of the other cooks. (R. 41). In response to further questioning by his counsel concerning his last job, Plaintiff testified that the situation with the other cook became physical and that he threatened the cook. (R. 49).

3

taking Prozac, Remeron and Xanax for his mental impairments,[4] as well as medication for his heart rhythm and blood pressure. (R. 40). Plaintiff experiences no side effects from his medications. (R. 41).

## C. Vocational Expert Testimony

At the hearing on Plaintiff's applications for DIB and SSI, the ALJ asked the VE to assume the following facts about Plaintiff: (1) he is 33 years old, (2) he has an 8th grade education, (3) he is limited in his ability to deal with the public and interact with peers and supervisors, and (4) he is unable to make complex decisions, follow detailed instructions, cope with stress in emergency situations and adapt to frequent changes in a work setting. The ALJ then asked the VE whether Plaintiff could perform any of his past work. The VE responded affirmatively, testifying that Plaintiff could perform his past job as an asbestos remover, which the VE had previously classified as unskilled, medium work as performed by Plaintiff. The ALJ then asked the VE whether there were any other jobs that Plaintiff could perform based on the assumed facts, and the VE identified the following jobs: general laborer, laundry worker, janitor/cleaner and vehicle cleaner. (R. 55, 57-58).

---

[4]Prozac is used to treat depression, obsessive-compulsive disorder, some eating disorders and panic attacks. Remeron is used to treat depression. Xanax is used to treat anxiety disorders and panic attacks. www.nlm.nih.gov/medlineplus/druginfo (last visited September 20, 2007).

4

Plaintiff's counsel was then given an opportunity to ask questions of the VE. First, Plaintiff's counsel asked the VE about the number of absences that are "generally tolerated by employers." The VE testified that the most absences an employer would tolerate with respect to an employee not reporting for work or leaving a job site without good cause would be 3 or 4 days a month. The VE qualified this response, however, testifying that no employer would tolerate absences of 3 or 4 days a month "for several months or more." Next, Plaintiff's counsel asked the VE whether an employee is expected to behave in an emotionally stable manner with respect to contact with co-workers and supervisors and to react appropriately to supervisory criticism, and the VE responded "certainly." Next, Plaintiff's counsel asked the VE whether employees are expected to "consistently maintain concentration to finish work tasks in a timely manner," the VE responded affirmatively. Finally, Plaintiff's counsel asked the VE whether an employee could maintain employment if he experienced two 30-minute episodes a week during which he would be unable to stay on task. In response, the VE testified that the employee would have to ask the employer to make accommodation for these episodes, such as lengthening the time of the employee's breaks which usually are 15 minutes. (R. 59-60).

### D.   **Medical Evidence in the Administrative Record**

On February 7, 2004, Plaintiff went to the Emergency Room of Hamot Medical Center complaining of heart palpitations earlier in the day.  Plaintiff's diagnoses were acute palpitations and PVCs without evidence of malignant arrhythmia, mild hypertension and mild resting sinus tachycardia.  Atenolol was prescribed for Plaintiff's mild tachycardia and hypertension.[5]  (R. 159-60).

On February 26, 2004, Plaintiff was seen by a physician at Frontier Family Practice for a new patient office visit. Plaintiff reported that he was disabled as a result of frequent panic attacks and depression, and that he was scheduled to be seen at a mental health facility for these conditions in a few days.  Plaintiff also reported that he had a heart condition which had been diagnosed as PVCs.  Although Plaintiff denied any chest pain or shortness of breath, the doctor noted that Plaintiff seemed to be very anxious about his heart condition. The doctor's assessment included (a) severe depressive disorder with generalized anxiety disorder and panic disorder for which Effexor was prescribed,[6] (b) alcohol and tobacco abuse, and (c)

---

[5]Atenolol is used alone or in combination with other medications to treat high blood pressure.  It is also used to prevent angina (chest pain) and treat heart attacks.  It works by slowing the heart rate and relaxing the blood vessels so the heart does not have to pump as hard.  www.nlm.nih.gov/ medlineplus/druginfo (last visited September 20, 2007).

[6]Effexor is used to treat depression.  www.nlm.nih.gov/ medlineplus/druginfo (last visited September 20, 2007).

6

hypertension for which Plaintiff was instructed to continue taking Atenolol as prescribed.

On March 15, 2004, Plaintiff was seen by a doctor at Frontier Family Practice complaining of twitching muscles in the left side of his chest and occasional tingling in the 4th and 5th digits of his right hand, but denying chest pain, shortness of breath, palpitations or stroke symptoms.[7]  Plaintiff reported that the Effexor was not working with regard to his anxiety and depression, and that he had an appointment with a psychiatrist the following Friday.  The doctor informed Plaintiff that the chest muscle twitching was "most likely insignificant" and related to his anxiety, and the tingling in his fingers did not appear to be anything acute at that time so they would just continue to monitor it.  As to Plaintiff's anxiety and depression, the doctor instructed Plaintiff to keep his appointment with the psychiatrist and to try taking the Effexor at night to avoid nausea.  (R. 179).

On March 19, 2004, Plaintiff underwent an initial psychiatric evaluation by Jaime Ayala, M.D. at the Adult Outpatient Clinic of Safe Harbor Behavioral Health ("Safe Harbor") for severe and frequent panic attacks, depression and obsessive-compulsive symptoms which had worsened during the

---

[7]The doctor noted that Plaintiff was "very worried about himself" and wanted "to make sure that everything is okay."  (R. 179).

previous 6 months.[8]  With respect to Plaintiff's mental status
examination, Dr. Ayala noted, among other things, that Plaintiff
was "concerned and manifest[ed] serious symptoms in three realms:
a) anxiety with panic, hyperalertness, poor sleep, frequent
awakenings with anxiety or sweating; b) obsessive-compulsive
preoccupations and rituals including hand washing, checking
doors, checking the car for safety, and checking fire alarms; c)
depression with hopelessness, strong passive wishes to 'not live
anymore', a sense of hopelessness and helplessness regarding his
future."  Dr. Ayala also noted that Plaintiff's attention and
concentration were poor due to his internal preoccupations; that
his somatization concerns had increased severely and included
frequent alarms regarding a heart condition;[9] and that his affect
showed "wide range with mood instability, severe free-floating
anxiety, frequent panic, and obsessive-compulsive preoccupations
being the norm throughout the day rather than the exception."
Dr. Ayala's diagnoses included (a) obsessive-compulsive disorder

---

[8]During his initial evaluation at Safe Harbor, Plaintiff
described his chief complaints as follows: "I shake all the time.
I feel like running away.  I cannot stand crowds.  I have
frequent panic attacks and I am receiving medications for
tachycardia and blood pressure.  I have severe fears of the dark
and also of a heart condition."  Plaintiff's main concerns were
described by Dr. Ayala as "racing thoughts of a fearful nature
with severe panic attacks, frequent somatic preoccupations, and
social phobia, which [Plaintiff] calls 'paranoia.'"  (R. 166).

[9]As to Plaintiff's heart condition, Dr. Ayala noted that the
likelihood of Plaintiff's high blood pressure and PVCs being
related to his severe panic disorder was very high.  (R. 167).

8

("OCD"), (b) panic disorder with agoraphobia and avoidant personality with strong obsessive-compulsive features, and the psychiatrist rated Plaintiff's score of the Global Assessment of Functioning ("GAF") Scale a 40 and his highest score during the previous year a 45.[10]  Dr. Ayala prescribed Xanax for Plaintiff to control panic, as well as Zoloft to control the severe obsessive-compulsive component of his mental impairment.[11]  Dr. Ayala noted that Plaintiff's prognosis was favorable if he adhered to the recommended treatment plan, estimating the expected duration of

---

[10]The Global Assessment of Functioning (GAF) Scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health to mental illness.  The highest possible score is 100, and the lowest is 1.  GAF scores between 31 and 40 denote "**[s]ome impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work ...)."  GAF scores between 41 and 50 denote "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  (bold face in original).  American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV"), at 32-34.

[11]Zoloft is used to treat depression, obsessive-compulsive disorder (bothersome thoughts that won't go away and the need to perform certain actions over and over), panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks), posttraumatic stress disorder (disturbing psychological symptoms that develop after a frightening experience), and social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life). www.nlm.nih.gov/medlineplus/druginfo (last visited September 20, 2007).

9

Plaintiff's treatment to be one year.  (R. 166-68).

Plaintiff was seen at Frontier Family Practice on March 22, 2004 for multiple somatic complaints including left hip and back pain.  Plaintiff also had a question regarding the safety of taking Xanax and Zoloft in addition to Atenolol.  (R. 177).  An office note dated March 29, 2004 indicates that Plaintiff was seen at Frontier Family Practice for multiple non-specific complaints.  Also, Plaintiff inquired into whether he should continue taking Atenolol.  (R. 175).

On April 14, 2004, Plaintiff called the Frontier Family Practice to speak with a doctor because he was having a panic attack and anxiety.  He was given an appointment for the next day.  (R. 174).  The notes of Plaintiff's office visit on April 15, 2004 indicate that he complained of an irregular heartbeat and presented with anxiety and panic attack symptoms, including a subjective feeling of a racing heartbeat and sense of impending doom.  He was instructed to continue taking the Xanax and Zoloft, and he was given a prescription for a medication to treat the overactivity caused by his panic attack.  (R. 172-73).

The notes of a medication check at Safe Harbor on April 26, 2004 indicate that Plaintiff reported the following: "I am a nervous wreck & not sleeping."  "I'm worried I'm going to die.  My heart will stop."  "Doesn't think the Zoloft is working."  Dr. Ayala reassured Plaintiff regarding the nature and severity of

10

his sinus arrhythmia, and, despite Plaintiff's complaints, Dr. Ayala described Plaintiff's response to the psychotropic medications as good and his mood as stable. Dr. Ayala rated Plaintiff's GAF score a 45. (R. 183).

On June 21, 2004, Sanford Golin, Ph.D., a State agency psychological consultant, completed a Mental RFC Assessment based on a review of Plaintiff's file, opining that Plaintiff's statements regarding his limitations were only partially credible and that the limitations resulting from Plaintiff's mental impairments do not preclude him from meeting the basic mental demands of competitive work on a sustained basis.[12] (R. 190-93). In a Psychiatric Review Technique form completed the same day, Dr. Golin opined that Plaintiff did not establish the required level of severity to meet Listing 12.04, relating to Affective Disorders, or Listing 12.06, relating to Anxiety-Related Disorders, in 20 C.F.R., Pt. 404, Subpt. P, App. 1. (R. 194-

---

[12]In the Mental RFC Assessment, Dr. Golin indicated that Plaintiff was not markedly limited in any area relating to Understanding and Memory, Sustained Concentration and Persistence, Social Interaction and Adaptation, and that he was only moderately limited in the following areas: (1) the ability to carry out detailed instructions; (2) the ability to maintain attention and concentration for extended periods of time; (3) the ability to complete a normal workday/workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (5) the ability to respond appropriately to changes in the work setting; and (6) the ability to set realistic goals or make plans independently of others. (R. 190-91).

11

206).

On July 12, 2004, Plaintiff presented to Safe Harbor for a medication check complaining of anxiety, depression, occasional passive suicidal ideation, an obsession with dying, poor sleep, mood instability, paranoia and possible psychotic episodes. Plaintiff's response to treatment was described as poor. Plaintiff was instructed to continue taking Xanax and Prozac as prescribed but discontinue Zoloft, and he was prescribed a low dosage of Risperdal.[13]  Plaintiff's GAF score was rated a 50.[14] (R. 215).

During a medication check at Safe Harbor on August 5, 2004, Plaintiff presented as obsessive, anxious and paranoid and reported being under financial stress.  Plaintiff's daily dosage of Risperdal was increased, and his GAF score was rated a 50. (R. 214).  During a medication check at Safe Harbor on September

---

[13]Risperdal is an antipsychotic medication that is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions).  It is also used to treat episodes of mania (frenzied, abnormally excited, or irritated mood) or mixed episodes (symptoms of mania and depression that happen together) in patients with bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). www.nlm.nih.gov/medlineplus/druginfo (last visited September 20, 2007).

[14]The notes of Plaintiff's medication checks at Safe Harbor between July 12, 2004 and December 9, 2005 were made by R. Walton, M.D., who apparently succeeded Dr. Ayala as Plaintiff's psychiatrist at Safe Harbor, and C. Dudinsky, a physician's assistant at Safe Harbor.  (R. 21).

12

29, 2004, Plaintiff complained of obsessive-compulsive symptoms, distraction, panic attacks, poor sleep, mood instability and frustration.  Plaintiff's daily dosages of Prozac and Risperdal were increased.  (R. 213).

During a medication check at Safe Harbor on January 10, 2005, Plaintiff reported that he had been "depressed lately;" that the increase in his Prozac was "alright;" that the Risperdal made him sleep a lot; that his anxiety had increased the previous few nights; that his panic attacks occurred about "once a week;" and that his dosage of Xanax was not strong enough.  Plaintiff was instructed to discontinue taking the Risperdal and Zyprexa was prescribed.[15]  (R. 212)

With respect to Plaintiff's February 9, 2005 medication check at Safe Harbor, Plaintiff's mood and affect were described as anxious.  Plaintiff was described as doing better on the Zyprexa, and it was noted that Plaintiff had no more visual hallucinations.  Plaintiff's daily dosage of Xanax was increased, and his GAF score was rated a 50.  (R. 211).

On May 23, 2005, Lynn Taylor, a physician's assistant at Safe Harbor, completed an Employability Re-Assessment Form for the Pennsylvania Department of Public Welfare, indicating that Plaintiff was temporarily disabled due to anxiety, and that his

---

[15]Zyprexa is used to treat the symptoms of schizophrenia.  It is also used to treat bipolar disorder.  www.nlm.nih.gov/ medlineplus/druginfo (last visited September 20, 2007).

13

temporary disability was expected to persist until at least
February 23, 2006. Plaintiff's diagnoses were listed as OCD and
panic disorder. (R. 223-24).

On May 26, 2005, Plaintiff presented as calm and comfortable
during his medication check at Safe Harbor, reporting that he had
been compliant with his medication regimen and that the frequency
of his panic attacks had decreased (*i.e.*, "maybe twice a week").
Plaintiff also reported that he believed the medications
decreased the frequency and intensity of his anxiety; however, he
complained of anger issues. No changes were made in Plaintiff's
medications and he was referred for anger management therapy.
Plaintiff's GAF score was rated a 55.[16] (R. 210).

During a medication check at Safe Harbor on August 16, 2005,
Plaintiff reported that he was doing well overall, although he
complained of increased anxiety. Plaintiff also reported that he
had not been participating in anger management therapy. No
changes were made in Plaintiff's medication regime, and his GAF
score was rated a 50. (R. 209).

During a medication check at Safe Harbor on October 11,
2005, Plaintiff reported that Xanax was helping; that he was
under a lot of stress at home (*i.e.*, struggling to pay rent, buy

---

[16]GAF scores between 51 and 60 denote "**[m]oderate symptoms**
(e.g., flat affect and circumstantial speech, occasional panic
attacks) **OR moderate difficulty in social, occupational, or
school functioning** (e.g., few friends or conflict with peers or
co-workers)." DSM-IV, at 32-34 (bold face in original).

clothes for his children, etc.); and that although his panic
attacks were occurring more frequently, the attacks were
manageable.  Plaintiff was instructed to discontinue taking the
Zyprexa and Remeron was prescribed.[17]  Plaintiff's GAF score was
rated a 45.  (R. 208).

During a medication check at Safe Harbor on December 9,
2005, Plaintiff reported that he was doing well overall, although
he got depressed "now and then."  Plaintiff also reported that
despite getting frustrated, he was no longer having problems with
anger; that his medications were working well; and that he
experienced no side effects from his medications.  At his
request, Plaintiff was referred for individual therapy.  No
changes were made in Plaintiff's medications, and his GAF score
was rated a 45.  (R. 207).

On January 26, 2006, Dr. Walton and Physician's Assistant
Carolyn Dudinsky completed an Employability Re-Assessment Form
for the Pennsylvania Department of Public Welfare in which they
indicated that Plaintiff was temporarily disabled due to ongoing
depression and OCD, and that the temporary disability was
expected to persist until June 26, 2006.  Plaintiff's diagnoses
were listed as OCD, panic disorder and avoidant personality
disorder.  (R. 221-22).

---

[17]As noted in footnote 4, Remeron is prescribed to treat
depression.

15

On February 6, 2006, Dr. Walton completed a form regarding

Plaintiff's mental abilities to perform unskilled work.   Dr.

Walton indicated that Plaintiff was unable to perform the

following mental abilities on a regular and continuing basis: (1)

remember work-like procedures; (2) maintain attention for

extended periods; (3) maintain regular attendance and be punctual

within customary tolerances; (4) sustain an ordinary routine

without special supervision; (5) work in coordination with or

proximity to others without being unduly distracted by them; and

(6) complete a normal workday/workweek without interruptions from

psychologically based symptoms and perform at a consistent pace

without an unreasonable number and length of rest periods.   (R.

225).

## III.   Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.

§ 405(g) and § 1383(c)(3) (incorporating § 405(g)), which provide

that an individual may obtain judicial review of any final

decision of the Commissioner by bringing a civil action in the

district court of the United States for the judicial district in

which the individual resides.   Based upon the pleadings and the

transcript of the record, the district court has the power to

enter a judgment affirming, modifying or reversing the

Commissioner's decision with or without a remand for a rehearing.

The Court's review of the Commissioner's decision is limited

16

to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance. Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence. Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

## IV. Legal Analysis

### A. The ALJ's Decision

In order to establish a disability under the Social Security
Act, a claimant must demonstrate an inability to engage in any
substantial gainful activity due to a medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than 12 months. 42 U.S.C.
§ 423(d)(1). A claimant is considered unable to engage in any
substantial gainful activity only if his physical or mental
impairment or impairments are of such severity that he is not
only unable to do his previous work but cannot, considering his
age, education, and work experience, engage in any other kind of

17

substantial gainful work which exists in the national economy.

42 U.S.C. § 423(d)(2)(A).

In <u>Burnett v. Commissioner of Social Security Admin.</u>, 220

F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure

an ALJ must follow in evaluating a claim for Social Security

disability benefits, stating in relevant part:

\*   \*   \*

In <u>Plummer</u>, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.  20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
<u>Bowen v. Yuckert</u>, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.  20 C.F.R.
§ 404.1520(c).  If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.  Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.  20 C.F.R.
§ 404.1520(d).  The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.  <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At
this stage, the burden of production shifts to the

18

> Commissioner, who must demonstrate the claimant is
> capable of performing other available work in order to
> deny a claim of disability.  20 C.F.R. § 404.1520(f).
> The ALJ must show there are other jobs existing in
> significant numbers in the national economy which the
> claimant can perform, consistent with her medical
> impairments, age, education, past work experience, and
> residual functional capacity.  The ALJ must analyze the
> cumulative effects of all the claimant's impairments in
> determining whether she is capable of performing work
> and is not disabled.

Plummer, 186 F.3d at 428.

* * *

220 F.3d at 118-19.

With respect to the ALJ's application of the five-step

sequential evaluation in the present case, steps one and two were

resolved in Plaintiff's favor: that is, the ALJ found that

Plaintiff had not engaged in substantial gainful activity since

his alleged onset date of disability, and the medical evidence

established that Plaintiff suffers from PVCs without evidence of

malignant arrhythmia, mood disorder, NOS (not otherwise

specified) and generalized anxiety disorder, which are severe

impairments.  (R. 17).  Turning to step three, the ALJ found that

Plaintiff's impairments were not sufficiently severe to meet or

equal the requirements of any listed impairment in 20 C.F.R., Pt.

404, Subpt. P, App. 1.  (R. 17).  As to step four, based on the

testimony of the VE, the ALJ found that Plaintiff cannot perform

his past relevant work as an assembler in the plastics industry,

a dishwasher, an oven tender in a metal shop or a line cook, but

19

that he could perform his past relevant work as an asbestos
remover. (R. 23). Despite finding that Plaintiff could perform
one of his past jobs, the ALJ proceeded to step five, and, based
on the testimony of the VE, she found that considering
Plaintiff's age, education, past work experience and RFC, there
were a significant number of other jobs in the national economy
which Plaintiff could perform, including the jobs of a general
laborer, a laundry worker, a janitor/cleaner and a vehicle
cleaner.[18]  (R. 24).

## B. Plaintiff's Arguments

i

The ALJ identified Plaintiff's severe mental impairments as
mood disorder, NOS and generalized anxiety disorder, and she
analyzed those impairments under Listing 12.04, relating to
Affective Disorders, and Listing 12.06, relating to Anxiety-
Related Disorders.[19]  (R. 17). Plaintiff asserts that the ALJ
erred by failing to explain her reasons for rejecting his

_____

[18]With respect to Plaintiff's RFC, the ALJ found that
Plaintiff retained the RFC to perform work at all exertional
levels which (a) did not generally involve contact with the
public, (b) did not require more than minimal interaction with
peers and supervisors, (c) did not require complex
decisionmaking, (d) did not involve detailed instructions, (e)
did not involve the need to cope with stress in emergency
situations, and (f) did not involve frequent changes in the work
setting.  (R. 19).

[19]In her decision, the ALJ also identifies Plaintiff's severe
mental impairments as major depressive disorder and anxiety
disorder.  (R. 18).

20

diagnoses of OCD, Panic Disorder with Agoraphobia and Avoidant

Personality Disorder with strong obsessive-compulsive features,

which were the diagnoses listed by Dr. Ayala following his

initial psychiatric evaluation of Plaintiff at Safe Harbor on

March 19, 2004.  (R. 167).  After consideration, the Court

concludes that there is no basis for Plaintiff's assertion that

the ALJ rejected Dr. Ayala's initial diagnoses of his mental

impairments.

      According to the DSM-IV, Axis I diagnoses are a patient's

clinical disorders which are the focus of psychiatric treatment,

and Axis II diagnoses are a patient's personality or

developmental disorders.  DSM-IV, at 27-29.  Following

Plaintiff's initial psychiatric evaluation at Safe Harbor on

March 19, 2004, Dr. Ayala listed Plaintiff's Axis I diagnoses as

OCD and Panic Disorder with Agoraphobia, and his Axis II

diagnosis as Avoidant Personality with strong obsessive-

compulsive features.  (R. 167).  As a result, the focus of

Plaintiff's treatment following his initial evaluation at Safe

Harbor was OCD and Panic Disorder with Agoraphobia, and the DSM-

IV classifies both of these disorders (Codes 300.3 and 300.21,

respectively) as Anxiety Disorders.  DSM-IV, at 429, 441, 462-63.

In her decision, the ALJ analyzed Plaintiff's mental impairments

under Listing 12.06 relating to Anxiety-Related Disorders, and

she specifically discussed the evidence regarding Plaintiff's

21

history of panic attacks, symptoms of agoraphobia and OCD.[20]   (R.
18-20).   Accordingly, Plaintiff's argument that the ALJ rejected
Dr. Ayala's diagnoses on March 19, 2004 is meritless.

As to the ALJ's analysis of Plaintiff's mental impairments
under Listing 12.04 relating to Affective Disorders,[21] following
Plaintiff's second appointment with Dr. Ayala on April 26, 2004,
the psychiatrist listed Plaintiff's diagnosis as Code 296.30
which, according to the DSM-IV, is one of the Mood Disorders,
i.e., Major Depressive Disorder, Recurrent.   DSM-IV, at 345, 376.
Subsequently, all but one of the Safe Harbor records relating to
Plaintiff's appointments for medication management list Code
296.90 as Plaintiff's diagnosis (R. 207, 208, 209, 210, 211, 212,
214, 215),[22] which, according to the DSM-IV, also is one of the

_____

[20]Listing 12.06 describes Anxiety-Related Disorders as
follows: "In these disorders anxiety is either the predominant
disturbance or it is experienced if the individual attempts to
master symptoms; for example, confronting the dreaded object or
situation in a phobic disorder or resisting the obsessions or
compulsions in obsessive compulsive disorders."   20 C.F.R., Pt.
404, Subpt. P, App. 1.

[21]Listing 12.04 describes Affective Disorders as follows:
"Characterized by a disturbance of mood, accompanied by a full or
partial manic or depressive syndrome.   Mood refers to a prolonged
emotion that colors the whole psychic life; it generally involves
either depression or elation."   20 C.F.R., Pt. 404, Subpt. P,
App. 1.

[22]The only other diagnosis listed for Plaintiff in the
subsequent Safe Harbor records which were completed in
conjunction with the management of Plaintiff's medication is OCD
(Code 300.3) (R. 213), which, as noted previously was addressed
by the ALJ in her analysis of Plaintiff's mental impairments
under Listing 12.06.

22

Mood Disorders, *i.e.*, Mood Disorder, NOS.[23]  DSM-IV, at 346, 410.
Under the circumstances, the ALJ also properly analyzed
Plaintiff's mental impairments under Listing 12.04.

ii

In denying Plaintiff's applications for DIB and SSI, the ALJ
accorded "significant weight" to the findings of Dr. Golin, the
non-examining State agency psychological consultant who completed
a Mental RFC Assessment on June 21, 2004 based on a review of
Plaintiff's file.  (R. 22).  As noted earlier, Dr. Golin found
that Plaintiff was not significantly limited or only moderately
limited in numerous work-related areas involving Understanding
and Memory, Sustained Concentration and Persistence, Social
Interaction and Adaptation.  (R. 190-91).  In explaining these
findings, Dr. Golin stated:

> The claimant alleges disability due to Panic Attacks and
> Anxiety.  The medical evidence establishes medically
> determinable impairments of Major Depression, Panic Disorder
> and GAD.  Cl. hyas (sic) shown a good response to
> psychotropic medications.
>
> The claimant evidenced no impairment of memory function
> secondary to his impairment.  He is capable of working
> within a work schedule and at a consistent pace.
> Furthermore, he would be able to maintain regular attendance
> and be punctual.  He could be expected to complete a normal

---

[23]The DSM-IV states that Code 296.90 (Mood Disorder Not
Otherwise Specified) is the category that includes disorders
"with mood symptoms that do not meet the criteria for any
specific Mood Disorder and in which it is difficult to choose
between Depressive Disorder Not Otherwise Specified and Bipolar
Disorder Not Otherwise Specified (*e.g.*, acute agitation).  DSM-
IV, at 410.

workweek without exacerbation of psychological symptoms. Moreover, he is able to maintain socially appropriate behavior and can perform the personal care functions needed to maintain an acceptable level of personal hygiene.  He is able to maintain socially appropriate behavior.  His ADLs and social skills are functional from a psychiatric standpoint.  He can sustain an ordinary routine and adapt to routine changes without special supervision.  There are no restrictions in his abilities in regards to understanding and memory.

Based on the evidence of record, the claimant's statements are found to be partially credible.

The limitations resulting from the impairments do not preclude the claimant from meeting the basic mental demands of competitive work on a sustained basis.

(R. 192).

Plaintiff asserts that the ALJ erred in according "significant weight" to the findings of Dr. Golin which were based on an incomplete record.  After consideration, the Court agrees.

With respect to the manner in which medical opinions are to be weighed in reviewing claims for disability benefits, the Social Security Regulations provide in pertinent part:

\*     \*     \*

(d) *How we weigh medical opinions*.  Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.[24]

---

[24]Under Section (d)(2), if "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight.  20 C.F.R.

\*     \*     \*

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, *because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.* (Emphasis added).[25]

\*     \*     \*

20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).[26]

_____

§§ 404.1527(d)(2), 416.927(d)(2).

[25]The other factors to be considered in weighing medical opinions in Social Security disability cases include (1) the examining relationship; (2) the treatment relationship; (3) consistency; (4) specialization; and (5) any other factor brought to the Social Security Administration's attention which tends to support or contradict a medical opinion. 20 C.F.R. §§ 404.1527(d)(1),(2),(4),(5) and (6), 416.927(d)(1),(2),(4),(5) and (6).

[26]Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000). With respect to weighing medical opinions, Social Security Ruling 96-6p provides in pertinent part: "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources." See also Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir.19986), quoting Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir.1984)("It is well established that the opinions of a doctor who has never examined a patient 'have less probative force as a general matter, than they would

25

.

Regarding the issue of supportability, the medical and other evidence that was available for Dr. Golin's review at the time he completed Plaintiff's Mental RFC Assessment on June 21, 2004 was very limited, consisting of the following: (a) Hamot Medical Center records relating to Plaintiff's emergency room visit for heart palpitations on February 2, 2004 (R. 159-64); (b) records of Frontier Family Practice relating to Plaintiff's treatment for his heart condition, anxiety, panic attacks and depression during the period February 26, 2004 to April 15, 2004 (R. 172-80); (c) the report of Plaintiff's initial psychiatric evaluation by Dr. Ayala at Safe Harbor on March 19, 2004 (R. 166-68); (d) a progress note written by Dr. Ayala in connection with Plaintiff's first follow-up visit on April 26, 2004 (R. 183); and (e) a Daily Activities Questionnaire completed by Plaintiff on April 5, 2004 (R. 115-24).[27]

With respect to Dr. Golin's findings regarding Plaintiff's

---

have had if [the doctor] had treated or examined him'").

[27]The hearing before the ALJ in this case was held on February 9, 2006, almost 20 months after Dr. Golin completed Plaintiff's Mental RFC Assessment. In completing Plaintiff's Mental RFC Assessment, Dr. Golin did not have the benefit of (1) Plaintiff's treatment records from Safe Harbor for the period July 12, 2004 to December 9, 2005 (R. 207-20); (2) the Employability Re-Assessment Forms completed by Plaintiff's mental health providers at Safe Harbor for the Pennsylvania Department of Public Welfare on May 23, 2005 and January 20, 2006 (R. 221-24); or (3) the opinion rendered by Dr. Walton, the psychiatrist who succeeded Dr. Ayala as Plaintiff's treating psychiatrist, on February 6, 2006 regarding Plaintiff's mental abilities to perform unskilled work (R. 225).

work-related mental abilities, the Court can find little, if any,
support in the above-referenced evidence for a majority of the
findings. For example, Dr. Golin states that Plaintiff has
"shown a good response to psychotropic medications." The only
possible evidence that could support this finding is the progress
note written by Dr. Ayala on April 26, 2004 in connection with
Plaintiff's first follow-up appointment at Safe Harbor for
medication management.[28] (R. 183). However, a review of the
entire April 26, 2004 progress note reveals a conflict in Dr.
Ayala's notations. The progress note indicates that Plaintiff
made the following statements when he presented to Dr. Ayala on
April 26, 2004: "I am a nervous wreck & not sleeping." "I'm
worried I'm going to die. My heart will stop." "Doesn't think
the Zoloft is working." These statements clearly conflict with
Dr. Ayala's notation that Plaintiff showed a good response to the
psychotropic medications which were prescribed at the time of
Plaintiff's initial psychiatric evaluation at Safe Harbor on
March 19, 2004. Moreover, Dr. Ayala rated Plaintiff's GAF score
a 45 on the April 26, 2004 progress note, indicating serious
impairment in social or occupational functioning,[29] which, again,
conflicts with his notation that Plaintiff had shown a good

---

[28]Dr. Ayala's notation merely stated: "Good response to
xtropics." (R. 183).

[29]See footnote 10.

27

response to the recently prescribed psychotropic medications. Based on the foregoing, the Court concludes that the meaning of the notation at issue is unclear. The notation could have related to Plaintiff's failure to report any side effects from the low dosages of his recently prescribed psychotropic medications.[30]   Under the circumstances, Dr. Golin's apparent reliance on Dr. Ayala's April 26, 2004 notation regarding Plaintiff's response to psychotropic medications to support his findings concerning Plaintiff's mental RFC is misplaced.

Turning to Dr. Golin's findings that Plaintiff was able to (a) work within a schedule and perform at a consistent pace, (b) maintain regular attendance and be punctual, (c) complete a normal workweek without exacerbation of psychological symptoms, (d) maintain socially appropriate behavior, (e) maintain an

---

[30]As noted previously, on February 26, 2004, Plaintiff's family physician prescribed Effexor to control Plaintiff's depression, anxiety and panic attacks. During the follow-up visit on March 15, 2004, Plaintiff complained to his family physician that the Effexor made him nauseous.  (R. 179-80).  Four days later, Plaintiff underwent his initial psychiatric evaluation at Safe Harbor and Dr. Ayala discontinued the Effexor. Instead, he  prescribed a low dosage of Xanax pending Plaintiff's clinical response to the medication and a "slow titration" of Zoloft with periodic increases which Dr. Ayala noted could take 14 to 28 weeks to control the "severe OCD component" of Plaintiff's mental impairment.  (R. 168).  No complaints of side effects from the Xanax or the Zoloft were written on the progress note which was made in conjunction with Plaintiff's first follow-up visit with Dr. Ayala.  Thus, it is likely that the notation respecting Plaintiff's good response to the psychotropic medications merely related to his apparent failure to complain of side effects.  In any event, the basis for the notation is unclear.

acceptable level of personal hygiene, (f) function from a psychiatric standpoint with regard to activities of daily living and social skills, and (g) adapt to routine changes without special supervision, the Court's review of the evidence which was available to Dr. Golin at the time he completed Plaintiff's Mental RFC Assessment on June 21, 2004 reveals no support for these findings.

With respect to the records of Frontier Family Practice and the medication management progress note relating to Plaintiff's follow-up visit with Dr. Ayala on April 26, 2004, these records do not address any of the work-related abilities that Dr. Golin found Plaintiff capable of performing.

As to the report of Plaintiff's initial psychiatric evaluation at Safe Harbor on March 19, 2004, Dr. Ayala noted "serious symptoms" in the following three realms: anxiety (*i.e.*, panic, hyperalertness, poor sleep, frequent awakenings with anxiety or sweating), OCD (*i.e.*, rituals including hand washing, checking doors, checking the car for safety and checking the fire alarms), and depression (*i.e.*, hopelessness, strong passive wishes to "not live anymore" and helplessness). Dr. Ayala also noted that Plaintiff's attention and concentration were "poor due to his internal preoccupations," and that Plaintiff's affect was wide ranging with "mood instability, severe free-floating anxiety, frequent panic and obsessive-compulsive preoccupations

29

being the norm throughout the day rather than the exception."
Clearly, this evidence does not support Dr. Golin's June 21, 2004
findings that Plaintiff was capable of working within a schedule
and performing at a consistent pace; that Plaintiff would be able
to maintain regular attendance and be punctual; that Plaintiff
could be expected to complete a normal workweek without
exacerbation of psychological symptoms; that Plaintiff was
capable of maintaining socially appropriate behavior; or that
Plaintiff could adapt to routine changes without special
supervision.

Finally, regarding the only remaining evidence available to
Dr. Golin at the time he completed Plaintiff's Mental RFC
Assessment on June 21, 2004, *i.e.*, the Daily Activities
Questionnaire completed by Plaintiff on April 5, 2004, a review
of the questionnaire reveals little support for Dr. Golin's
findings concerning Plaintiff's work-related mental abilities.
Although Plaintiff indicated in the questionnaire that his mental
impairments did not result in the need for special help or
reminders to take care of his personal needs, or totally preclude
his ability to drive and perform household chores, or cause
regular problems in his ability to get along with family, friends
and neighbors, or preclude his participation in activities with
relatives and friends, or totally preclude his ability to start
and complete projects or activities such as reading a book, Dr.

30

Golin ignored a significant amount of additional information
provided by Plaintiff in the questionnaire which does not support
a finding that Plaintiff retains the mental RFC to perform
substantial gainful activity on a regular and continuing basis.
Specifically, Plaintiff indicated in the questionnaire that his
driving is limited to doctor appointments and picking up
prescriptions at the pharmacy; that he goes grocery shopping with
relatives due to anxiety attacks; that his activities in general
are limited; that he has problems getting along with family,
friends and neighbors "at times;" that he does not respond well
to criticism; that he does not belong to any groups or clubs;
that he has been in fights; that he has been fired; that he did
not have good attendance when he worked in the past; and that he
had trouble getting along with supervisors and coworkers when he
worked in the past.  Dr. Golin's failure to acknowledge all of
the information provided by Plaintiff in the questionnaire
regarding the limitations resulting from his mental impairments
undermines the Mental RFC Assessment completed on June 21, 2004.

In sum, the Court concludes that Dr. Golin's June 21, 2004
opinion that Plaintiff retained the mental RFC to perform
substantial gainful activity on a regular and continuing basis
was not supported by substantial evidence.  Therefore, the ALJ
erred by according "significant weight" to the opinion.

31

iii

In her decision, the ALJ rejected the GAF scores assigned to
Plaintiff by Dr. Walton, his long-time treating psychiatrist at
Safe Harbor, stating that the scores "do not make much sense as
other evidence, including claimant's own daily activities
questionnaire (Exhibit 5E) and testimony at hearing, suggest a
higher level of functioning."[31]  (R. 21).  The ALJ also
disregarded the medical source statement completed by Dr. Walton
in February 2006 concerning Plaintiff's mental abilities to
perform unskilled work,[32] stating that his opinion is "simply
unsupported."[33]  (R. 21).  Instead, as noted above, the ALJ

_____

[31]As noted previously, Dr. Walton assigned (in chronological
order) a GAF score of 50 to Plaintiff on July 12, 2004, August 5,
2004 and February 9, 2005, a GAF score of 55 on May 26, 2005, a
GAF score of 50 on August 16, 2005, and a GAF score of 45 on
October 11, 2005 and December 9, 2005.  (R. 207-15).

[32]Medical source statements are medical opinions submitted by
acceptable medical sources, including treating sources and
consultative examiners, about what an individual can still do
despite a severe impairment(s), in particular about an
individual's physical or mental abilities to perform work-related
activities on a sustained basis.  Medical source statements
submitted by treating sources provide medical opinions which are
entitled to special significance and may be entitled to
controlling weight on issues concerning the nature and severity
of an individual's impairment(s).  See Social Security Ruling 96-
5p.

[33]The ALJ also disregarded the Employability Re-Assessment
Forms completed by Plaintiff's mental health providers at Safe
Harbor (including Dr. Walton) in May 2005 and January 2006, which
indicate that Plaintiff was temporarily disabled as a result of
his mental impairments.  However, as acknowledged by Plaintiff,
it is well established that medical opinions regarding the
ultimate issue of disability are not binding on the Commissioner.

32

accorded "significant weight" to the June 21, 2004 Mental RFC Assessment completed by the non-examining State agency psychological consultant based on an incomplete record. Plaintiff asserts that the ALJ erred by according more weight to the opinion of the non-examining State agency psychological consultant than the opinion of his long-time treating psychiatrist. Again, the Court agrees.[34]

Under the Social Security Regulations, opinions of medical sources are not treated equally. More weight generally is given to the opinion of an examining source than to the opinion of a source who has not examined a claimant, 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1), and more weight generally is given to opinions from treating sources "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical

_____

(Pl's Brief, p. 11).

[34]Because the ALJ accorded no weight to Dr. Walton's findings concerning the limitations in Plaintiff's mental abilities to perform unskilled work, she did not include the limitations in the hypothetical question posed to the VE at the hearing. In light of the Court's conclusion that the ALJ erred by rejecting Dr. Walton's opinion, the hypothetical question was deficient and the VE's response does not constitute substantial evidence supporting the ALJ's adverse decision. See Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002), citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir.1987)("A hypothetical question posed to a vocational expert 'must reflect *all* of a claimant's impairments.'").

33

evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In Cadillac v. Barnhart, 84 Fed.Appx. 163 (3d Cir.2003), the Plaintiff's claim for Social Security benefits alleging disability due to back pain and Hepatitis C was denied by the Commissioner, and the Plaintiff sought review in district court. The district court affirmed the Commissioner's decision, and the claimant appealed. The Third Circuit reversed the Commissioner's decision and remanded the case for further proceedings, stating in relevant part:

\*   \*   \*

Even were the ALJ's determination at Step Three proper, we would reverse because the ALJ erred in assessing the medical evidence to arrive at Cadillac's RFC. "While the ALJ is, of course, not bound to accept physicians' conclusions, he [or she] may not reject them unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." Kent v. Schweiker, 710 F.2d 110, 115 n.5 (3rd Cir.1983)(citing Cotter, 642 F.2d at 705-06). See Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir.1992) (noting the Commissioner has an obligation to weigh medical evidence and make choices between conflicting accounts).

The ALJ gave controlling weight to the medical assessments conducted by the non-examining State Agency physicians. Reliance on State Agency physicians, in and of itself, is not problematic. The State Agency physicians, however, issued their assessment of Cadillac in April 1997; Cadillac, however, was hospitalized in May 1997, after the State Agency physicians had completed their assessments.

During his hospitalization, Cadillac was given a CT scan

34

of his back.  In December of 1997, he visited a back
specialist, who appears to have had access to the CT scan.
The specialist, Dr. Steinway, classified Cadillac's
condition as Class III, or adequate to perform little or
none of the duties of his usual occupation or self care.
The ALJ discounted Dr. Steinway's assessment because she
could not tell from the record whether Dr. Steinway had
classified Cadillac's impairments as Class III in the short
term or as a permanent condition.  She then gave controlling
weight to the non-examining State Agency physicians.  But
the State Agency physicians never had the opportunity to
consider the major medical events that occurred in 1997.
The one doctor that did - Dr. Mylod - determined that
Cadillac was disabled.

     The ALJ does have the authority to reject conflicting
medical evidence.  "When a conflict in the evidence exists,
the ALJ may choose whom to credit but 'cannot reject
evidence for no reason or for the wrong reason.'" Plummer,
186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058,
1066 (3d Cir.1993)).  Here, the ALJ rejected medical
evidence for the wrong reason.  Where the ALJ substitutes
his or her own medical opinion for that of a physician we
must reverse.  See Kent, 710 F.2d at 115 ("[T]he ALJ's
conclusion ... is merely a function of the ALJ's own medical
judgment.  As such, his conclusion may not be permitted to
stand, for we have pointed out time and again that these
kinds of judgments are not within the ambit of the ALJ's
expertise.")(citing Gober, 574 F.2d 772; Schaaf v. Matthews,
574 F.2d 157 (3d Cir.1978)).

     The ALJ discounted the medical evidence of Dr. Mylod -
the only medical opinion based on a complete record -
against that of the State Agency physicians who never had
access to the CT scan or the hospital records from
Cadillac's 1997 treatments.  It was error for the ALJ to
have favored medical opinions based on an incomplete record
over those based on the complete record, and to have done so
because she injected her own medical opinion into the mix.
Accordingly, her decision to rely on the RFCs of the State
Agency physicians cannot stand.

                    *    *    *

84 Fed.Appx. at 168-69.

     Similarly, in the present case, the Court concludes that the

35

ALJ erred by favoring the medical opinion of a non-examining
State agency psychological consultant which was based on an
incomplete record over the medical opinion of Plaintiff's
treating psychiatrist whose opinion regarding Plaintiff's mental
abilities to perform substantial gainful activity is supported by
two years of treatment records,[35] and she did so based on her own
medical opinion.

For example, there is no medical evidence contradicting the
GAF scores assigned to Plaintiff by Dr. Walton.  Rather, the ALJ
rejected Dr. Walton's GAF scores on the ground that they did not
"make much sense" in light of the Daily Activities Questionnaire
completed by Plaintiff and his testimony at the hearing.[36]  First
and foremost, the evidence on which the ALJ relied to reject Dr.
Walton's GAF scores is not medical evidence.  Thus, the ALJ
impermissibly rejected Dr. Walton's GAF scores based on her own
medical opinion.  Moreover, according to the Daily Activities
Questionnaire completed by Plaintiff on April 5, 2004, as well as
Plaintiff's hearing testimony on February 9, 2006, his activities

---

[35]As noted previously, Plaintiff's initial psychiatric
evaluation at Safe Harbor was performed in March 2004 and Dr.
Walton's assessment of Plaintiff's mental abilities to perform
unskilled work was completed in February 2006.

[36]As noted by Plaintiff, GAF scores, standing alone, are not
determinative in a Social Security disability case based on
mental impairments.  Nevertheless, the scores are pertinent and
should be considered with the other medical evidence of record.
(Pl's Brief, p. 13).

are very limited and do not support a finding that he retains the
mental RFC to perform substantial gainful activity on a regular
and continuing basis, *i.e.*, 8 hours a day, 5 days a week.  See
Smith v. Califano, 637 F.2d 968 (3d Cir.1981)(It is well
established that sporadic or transitory activity does not
disprove disability).

There also is no medical evidence based upon the complete
record to support the ALJ's rejection of Dr. Walton's February
2006 assessment of Plaintiff's mental abilities to perform
unskilled work.  The ALJ found that Dr. Walton's assessment "may
be accorded little or no weight" because the assessment consisted
of a check-box or form report (R. 21 n.1).  In so finding, the
ALJ ignores the fact that Dr. Walton's assessment specifically
indicates that the opinions rendered therein are based upon
mental status examinations, observation of Plaintiff, Plaintiff's
clinical history and a review of Plaintiff's symptoms, as well as
the fact that the record contains Safe Harbor treatment records
covering a two-year period.  (R. 225).  In addition, as noted by
Plaintiff, it is ironic that the ALJ disregarded the assessment
of Plaintiff's long-time treating psychiatrist concerning his
work-related mental abilities because it is set forth in a check-
box or form report, while according significant weight to the
Mental RFC Assessment of a non-examining State agency
psychological consultant that is a check-box or form report

accompanied by a short explanation based on very limited evidence. (Pl's Brief, p. 12). See Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir.1986)("[W]here ... residual functional capacity reports are unaccompanied by thorough written reports, their reliability is suspect, especially when they conflict with the reports of the claimant's treating physician.").

Finally, with regard to the ALJ's reliance on notations in the treatment records of Safe Harbor indicating improvement in Plaintiff's mental impairments,[37] as noted by Plaintiff, even if his mental impairments improved as a result of the treatment he received at Safe Harbor, such improvement is not necessarily indicative of the ability to perform work on a regular and continuing basis. In Morales v. Apfel, 225 F.3d 310 (3d Cir.2000), the Third Circuit stated in relevant part:

\*   \*   \*

Nor was it proper for the ALJ to reject Dr. Erro's opinion based on Dr. Erro's notation that Morales was stable with medication. The relevant inquiry with regard to a disability determination is whether the claimant's condition prevents him from engaging in substantial gainful activity. See 42 U.S.C. § 423(d)(1)(A). For a person, such as Morales, who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic. Dr. Erro's observations that Morales is "stable and well

---

[37]Based on the Safe Harbor treatment records, the ALJ noted in her decision that Plaintiff's "mood and affect had improved" and there was a "diminution of symptomology" by December 2005. (R. 21). She also stated that in recent progress notes, Dr. Walton noted that Plaintiff was "calmer with improved mood." (R. 22).

38

•

controlled with medication" during treatment does not
support the medical conclusion that Morales can return to
work.  Dr. Erro, despite his notation, opined that Morales's
mental impairment rendered him markedly limited in a number
of relevant work-related activities.  Other information in
the treatment records supports this opinion.  Thus, Dr.
Erro's opinion that Morales's ability to function is
seriously impaired or nonexistent in every area related to
work shall not be supplanted by an inference gleaned from
treatment records reporting on the claimant in an
environment absent of the stresses that accompany the work
setting.

\*    \*    \*

225 F.3d at 319.

Similarly, in the present case, Dr. Walton's opinion in February

2006 that Plaintiff was totally lacking in a number of mental

abilities necessary to perform unskilled work cannot be

supplanted by the sparse notations in Safe Harbor's treatment

records regarding Plaintiff's improvement on psychotropic

medications.  Despite any improvement in Plaintiff's mental

impairments noted in the records of Plaintiff's treatment at Safe

Harbor, those records also contain a significant amount

of information, including consistent GAF scores indicating

serious impairment in social and occupational functioning and

numerous changes in Plaintiff's psychotic medications, which

supports Dr. Walton's opinion.

Based on the foregoing, the Court concludes that the ALJ's

decision to reject the medical source statement completed by

Plaintiff's long-time treating psychiatrist on February 6, 2006

and rely on the June 21, 2004 Mental RFC Assessment completed by

•

the nonexamining State agency psychological consultant based on
an incomplete record cannot stand.[38]

V

In conclusion, the Court notes the Third Circuit's
observation in Morales, supra, that "[t]he principle that an ALJ
should not substitute his lay opinion for the medical opinion of
experts is especially profound in a case involving a mental
disability."  This is precisely what the ALJ did in the present
case.  Under the circumstances, the ALJ's decision denying
Plaintiff's applications for DIB and SSI will be reversed.

William L. Standish
United States District Judge

Date: September 27th, 2007

---

[38]Plaintiff also argues that the ALJ erred in finding that
his statements concerning the intensity, duration and limiting
effects of his mental impairments were not entirely credible.
(Pl's Brief, pp. 17-20).  In light of the Court's conclusion that
the ALJ's adverse decision is not supported by substantial
evidence, it is not necessary to address this additional
argument.

40